IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, WESTERN DIVISION

*In Re the Application Of:*

STEPHEN JOHN YOUNG,
on behalf of B.J.Y., minor child,

                Petitioner,

and                                      Case No.

KAITLYN RAE YOUNG,

                Respondent.

**VERIFIED COMPLAINT AND PETITION OF STEPHEN JOHN YOUNG FOR ISSUANCE OF A SHOW CAUSE ORDER AND FOR RETURN OF THE MINOR CHILD TO THE CHILD'S HABITUAL RESIDENCE OF IRELAND AND <u>JURISDICTION OF IRELAND</u>**

NOW COMES the Petitioner, STEPHEN JOHN YOUNG (hereinafter "Stephen"), on behalf of B.J.Y., a minor child, by his attorneys, Ice Miller LLP, and as and for his Verified Complaint and Petition for Issuance of a Show Cause Order and For Return of the Minor Child to the Child's Habitual Residence of Ireland and Jurisdiction of Ireland and states as follows:

1. This verified complaint and petition is brought pursuant to:

   - The Convention on the Civil Aspects of International Child Abduction, done at the Hague on 25 October 1980 (the "Convention"); The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*

   - The Uniform Child Custody Jurisdiction and Enforcement Act, 750 ILCS 36/101 *et seq.* (the "UCCJEA").

2. The Convention went into effect in the United States on July 1, 1988, and was accepted between the United States and Ireland, the Habitual Residence of the minor child, on October 1, 1991.

3. The objective of the Convention is to secure the prompt return of the child wrongfully removed to and retained in any Contracting State (Article 1(a)) and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States (Article 1(b)). Article II of the Convention provides that "[t]he judicial or administrative authorities shall act expeditiously in proceedings for the return of children."

4. The provisions of the Convention have been given the force and effect of law by the United States Congress through the passage of the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* (1995) (hereinafter "ICARA"). The ICARA was enacted for the specific purpose of "establish[ing] procedures for the implementation of the Convention in the United States." 42 U.S.C. § 11601(b)(l).

5. Pursuant to Article 19 of the Convention a decision under the Convention is not a determination of any underlying child custody claims.

## JURISDICTION

6. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. 11603(a).

7. Venue is proper in the United States District Court for the Northern District of Illinois, pursuant to *28 U.S.C. § 9003, 28 U.S.C. § 139l(d) and 42 U.S.C. § 11603(b)*, because the Respondent, KAITLYN RAE YOUNG (hereinafter "Kaitlyn"), and the minor child who are the subject of this Verified Complaint and Petition are currently located in Garden Prairie, Illinois, a municipality in Boone County, Illinois, which is located in this District, Western Division.

## BACKGROUND ALLEGATIONS

8. Stephen is a resident of Ireland seeking the return of his minor child, who was wrongfully removed and continues to be wrongfully retained in the United States of America from

Ireland by the child's mother without Stephen's consent. Stephen is both an "applicant" as defined in *42 U.S.C. § 11602(1)* and a "petitioner" as defined in *42 U.S.C. § 11602(4)*.

9. The minor child, B.J.Y., a male, was born in Dublin, Ireland in 2021 and is currently three (3) years of age. A true and accurate copy of B.J.Y.'s Birth Certificate is attached as **Exhibit A**.

10. Stephen is the natural and biological Father of B.J.Y.

11. Stephen and Kaitlyn were married on April 16, 2020, in Bigfork, Montana. A copy of the parties' marriage certificate is attached as **Exhibit B**.

12. The parties have been living separate and apart since June 2023. A copy of the parties' separation agreement is attached as **Exhibit C**.

13. Prior to their wrongful retention in the United States, B.J.Y. resided in Ireland where pursuant to the separation agreement, Stephen and Kaitlyn shared equal custody of B.J.Y. B.J.Y. resided with each parent for seven days out of every fourteen days.

14. On December 6, 2024, Stephen dropped B.J.Y. off at school in the morning. Stephen expected Kaitlyn to retrieve B.J.Y. from school that afternoon, as this day was the start of Kaitlyn's time with B.J.Y. pursuant to their custody schedule. Stephen expected to see B.J.Y. next on December 11, 2024.

15. On the afternoon of December 6, 2024, Kaitlyn retrieved B.J.Y. from school and collected all of B.J.Y.'s belongings from the school's staff under the pretense of needing to wash them. Kaitlyn also advised the school's staff that B.J.Y. would not be in attendance the following week.

16. On December 11, 2024, Stephen arrived at B.J.Y.'s school in the afternoon to retrieve B.J.Y. and take him to see a light show at the Dublin Zoo. At this point, Stephen was

entirely unaware of any instructions Kaitlyn had given the school regarding B.J.Y.'s presence and had not agreed to any changes in the agreed upon custody arrangement, provided for in **Exhibit C**, with which both Stephen and Kaitlyn had previously complied.

17. When Stephen arrived at the school to retrieve B.J.Y., the school's staff relayed to Stephen what Kaitlyn had told them on December 6: that B.J.Y. was not expected to be in attendance that week. Upon learning that Kaitlyn had deviated from the custody arrangement, Stephen immediately made numerous attempts to contact Kaitlyn, but to no avail.

18. After trying and failing to contact Kaitlyn by phone, Stephen went to Kaitlyn's apartment to see if she was home. Upon arrival, Stephen did not see Kaitlyn's car nor any other indication that Kaitlyn or B.J.Y. was present. After attempting to contact anyone who may have been inside the apartment, Stephen used a virtual key belonging to a mutual friend to access the apartment and discovered that the apartment had been cleared out. All of Kaitlyn's and B.J.Y.'s clothes and other personal effects were gone along with a number of furniture items including B.J.Y.'s bed.

19. After still receiving no communication from Kaitlyn, Stephen took his mother and sister with him to the Shankill Garda[1] Station to seek help and advice from the authorities.

20. During their interview with Stephen, the Gardai[2] were able to establish that Kaitlyn's car had been sold and that a number of pieces of Kaitlyn's furniture were listed for sale on an online marketplace as early as two weeks prior under the pretense of needing to downsize the apartment. The Gardai were able to contact the management company for Kaitlyn's apartment and found that the last access to Kaitlyn's apartment occurred on the evening of December 5.

---

[1] The Garda Siochana is Ireland's national police and security service. See https://www.garda.ie/en/
[2] See footnote 1. The Gardai are officers of the Garda Siochana.

21. On the evening of December 11, Stephen received an email from Kaitlyn stating that she and B.J.Y. were at Kaitlyn's father's house in Illinois and had traveled there on December 7.

22. Kaitlyn has apparently started a divorce action in Boone County, Illinois and refuses to return B.J.Y. to his habitual residence of Ireland. This Petition should cause an immediate stay of the divorce proceeding. Allowing the divorce action to continue would frustrate the Hague Convention's goal of effecting the prompt return of a wrongfully removed child. Further, Article 16 of the Hague Convention provides that custody actions must not proceed following notice of a Hague Convention petition. There is no reason why divorce actions should be treated differently, especially if the divorce proceedings involve the question of custody.

## LEGAL STATUS OF STEPHEN AND THE CHILD

**Stephen's Custody Rights**.

23. The Court consults the law of the country of habitual residence in order to determine a petitioner's rights of custody. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010); *Norinder v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011). "The standard for finding that a parent was exercising his [or her] custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2021) (internal quotation marks and citation omitted).

24. At the time of the child's removal from Ireland, Stephen was exercising his rights of custody within the meaning of Articles Three and Five of the Convention by maintaining regular contact with the minor child at their residence in Ireland in accordance with the terms of

the Separation Agreement entered into between Stephen and Kaitlyn (see **Exhibit C**). But for Kaitlyn's removal and retention of the child, Stephen would have continued to exercise his rights of custody.

**Ireland is the Child's Habitual Residence**.

25. The term "habitual residence" is undefined by the Convention. *Koch v. Koch*, 450 F.3d 703, 708 (7th Cir. 2006). The determination of habitual residence "is a fact-specific inquiry that should be made on a case-by-case basis. Moreover, . . . a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001). The analysis "focuse[s] on the parents' last shared intent in determining habitual residence." *Koch*, 450 F.3d at 715. In the absence of a clear shared intent between the parties, the Supreme Court interprets the meaning of "habitual residence" within the Convention by claiming that "[a] child 'resides' where [he] lives," and that a residence is habitual only when it is "more than transitory," which will be necessarily fact specific. *Monasky v. Taglieri*, 589 U.S. 68, 76 (2020).

26. From the birth of the child until his wrongful retention on or about December 7, 2024, B.J.Y. resided in Ireland, splitting his time equally between Stephen and Kaitlyn.

27. The minor child's friends and family are located in Ireland, the child maintains an Irish passport and attends school in Ireland.

28. Stephen's habitual residence is Ireland, and he has maintained said residence since B.J.Y.'s birth.

29. Kaitlyn's habitual residence at the time of the child's removal and wrongful retention was Ireland.

30. There were never any discussions between Stephen and Kaitlyn to change the minor child's habitual residence from Ireland to the United States.

**Retention of the Child in the United States was Wrongful**.

4897-2743-5559.2       Page

31. In violation of Irish Law, specifically Article 6 of the Guardianship of Infants Act 1964, Kaitlyn's retention of the minor child without Stephen's authorization or consent or Order of Court is unlawful:

> "Article 6 – Rights of parents to guardianship:
>
> 1. The father and mother of an infant shall be guardians of the infant jointly."

The Eleventh Circuit has held, agreeing with Irish courts, that guardianship under Irish law creates a sufficient "right of custody" under the Hague Convention. *Hanley v. Roy*, 485 F.3d 641, 648 (11th Cir. 2007) (ordering a minor child to be returned to their testamentary guardians in Ireland after the child was removed without the guardians' consent to the United States). Further, courts have held that where there exists a joint guardianship of a minor child, the removal of that child without consent of one of the child's guardians is enough to establish a prima facie showing under the Hague Convention. *Judge v. Williams*, 2011 WL 3100346 at *5 (E.D.N.C. July 25, 2011). The Court in *Williams* clarified that custody rights stemming from joint guardianship include "the right to make decisions of overriding seminal importance to [the child]'s upbringing," and that, "[t]he nation where [the child] is reared is a matter of overriding seminal importance to [the child]'s upbringing, and Petitioner has the right to take part in that decision." *Id.* Here, as in *Williams*, Stephen has had his right to take part in the decision of where to raise his child stripped away. Stephen's custody rights arising from his status as a joint guardian of B.J.Y. have been and continue to be violated by the wrongful retention of B.J.Y. outside of Ireland.

32. In violation of Articles 3 and 5 of the Convention, Kaitlyn's retention of the minor child without Stephen's authorization or consent or Order of Court is unlawful:

> "Article 3.
> The removal or the retention of a child is to be considered wrongful where –
> *a)* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> *b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a)* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."
>
> "Article 5.
> For purposes of this Convention –
> 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence . . ."

33. On December 12, 2024, in Ireland, Stephen submitted his application pursuant to the Hague Convention requesting the immediate return of the minor child. A copy of Stephen's Hague Convention application is attached as **Exhibit D**.

### REMOVAL AND RETENTION OF THE CHILD BY KAITLYN

34. *42 U.S.C. § 11604(b)* conditions this Court's authority to order a child removed from a person having physical control of the child on the satisfaction of applicable requirements of state law.

35. *ICARA* also authorizes this Court, "[i]n furtherance of the objectives of ... the Convention ... [to] take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." *42 U.S. C. § 11604*. Under *Section 210(a) of the UCCJEA*, "[t]he court may order any party to the proceeding who is in this State or over whom the

court has personal jurisdiction to appear personally before the court. If that party has physical custody of the child, the court may order that he appear personally with the child…".

36. The purpose of the Convention is to determine which country is most appropriate to have jurisdiction, not to determine the best parent or to determine the best interest of the child. "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott v. Abbott*, 560 U.S. 1, 20 (2010). "The entire purpose of the Convention is to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction." *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir. 2012).

37. A Complaint under the Convention may be treated as an application for a Writ of Habeas Corpus under *28 U.S.C. §2241*, et seq., pursuant to which this Court may issue an order directing Respondent to show cause on an expedited basis why the children should not be returned immediately to the jurisdiction of their habitual residence in Ireland. See *Zajaczkowski v. Zajaczkowski*, 932 F. Supp. 128, 132 (D. Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus ... pursuant to *28 U.S.C.A. § 2243*"); see also *Miller v Miller*, 240 F.3d 392, 397- 98 (4th Cir. 2001); *In re: McCullough*, 4 F. Supp. 2d 411 (W. D. Penn., 1998); *Convention, Art. 11* (establishing a six-week target time frame for resolution of petitions under the Convention).

38. Kaitlyn removed the child from Ireland and wrongfully retained the child in the United States as of about December 7, 2024, within the meaning of Article 3 of the Convention, and she continues to wrongfully retain the child in the United States despite efforts on the part of Stephen to have the child returned.

39. The child is presently in the Northern District of Illinois.

40. Kaitlyn has concealed the child in the United States from Stephen since on or about December 7, 2024, and pending the return of the child, Stephen seeks rights of access pursuant to Article 21 of the Convention.

41. Stephen has the ability to provide safe passage from the United States to Ireland for the minor child.

42. Predicated upon the wrongful retention of the child by Kaitlyn and in accord with Article 26 of the Convention, Kaitlyn should be ordered to pay all necessary expenses, to include attorneys' fees and costs, incurred by Stephen in the preparation and presentation of this matter and in securing the return of the child to Ireland.

**WHEREFORE**, the Petitioner respectfully requests that this Court enter orders granting him the following relief:

    A.    A Preliminary Show Cause Order

    1.    Commanding the Respondent (with or without the minor child) to appear in this Court to show cause why the minor child has been kept from his father and why the minor child should not be returned to Ireland forthwith including the scheduling of an expedited preliminary hearing on the merits of the Complaint, an Order that Respondent show cause at this hearing why the child should not be returned to Ireland and, pursuant to *Federal Rule of Civil Procedure 64*, an Order that the trial of the action on the merits be expedited and consolidated with the hearing on the verified complaint;

    2.    Requiring Respondent to surrender to this Court any passports, residency and travel documents in her or the minor child's name;

    3.    Pursuant to 28 U.S.C. § 9004 and Article 16 of the Convention, prohibiting the child's removal from the jurisdiction of this Court pending final determination of the Petition;

4. Requiring Respondent to make the child available for daily communication via the internet and telephone pending a final resolution of the Petition; and

5. Providing that if Respondent fails to appear pursuant to this Court's Show Cause Order, this Court will issue an Order directing that the name of the minor child be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant will be issued for Respondent; and

B. A Final Order

1. An Order declaring and adjudicating that Respondent's retention of the child in the United States was wrongful under Articles 3 and 5 of the Convention;

2. An Order compelling the return of the minor child to his habitual residence in Bray, Ireland;

3. An Order requiring Respondent to pay the necessary expenses incurred by Petitioner in connection with these proceedings, pursuant to 22 U.S.C. § 9007, such expenses and costs to be resolved via post-judgment motion; and

4. Granting such other and further relief as this Court deems just and proper.

Dated this 21st day of March 2025

By: /s/ Jeffrey R. Platt        Je1

Jeffrey R. Platt (#6208148)
Jeffrey.Platt@icemiller.com
RJ Casey (#6348939)
RJ.Casey@icemiller.com
ICE MILLER LLP
Attorneys for Petitioner
200 W Madison Street,
Suite 3500
Chicago, Illinois 60606
(630) 955-4280